CLERKS OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

6/9/20
JULIA C. DUDLEY, CLERK
BY:  s/ ELLA SURBER
      DEPUTY CLERK

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| DAVID HOLBROOK, | Case No.:   1:20CV25 |
| Plaintiff, | |
| vs. | **CLASS ACTION COMPLAINT** |
| TENNESSEE VALLEY AUTHORITY and BVU AUTHORITY, | **JURY TRIAL REQUESTED** |
| Defendant | |

## CLASS ACTION COMPLAINT

Plaintiff David Holbrook, individually and on behalf of the putative class described

herein, brings this Complaint against the Tennessee Valley Authority ("TVA") and alleges as

follows:

1.     When Congress enacted the Tennessee Valley Authority Act, it statutorily

directed TVA to use industrial rates to subsidize domestic consumers, and afford them the lowest

possible rates:

> the projects herein provided for shall be considered primarily as for the
> benefit of the people of the section as a whole and particularly the
> domestic and rural consumers to whom the power can economically be
> made available, and accordingly that sale to and use by industry shall be a
> secondary purpose, to be utilized principally to secure a sufficiently high
> load factor and revenue returns which will permit domestic and rural use
> at the lowest possible rates . . .

16 U.S.C.A. § 831j.

2.     Congress thus mandated that TVA  secure "high . . . revenue returns" from

its sales to industry and use those high revenue returns to subsidize domestic consumers

and provide them with the "lowest possible rates."

3.     Congress made clear the mandatory nature of this directive by the repeated use of the term "shall."

4.     Nonetheless, in clear contravention of this Congressional directive, TVA has not set, and is not setting its rates in a manner designed to secure high revenue returns from industry in order to secure the lowest possible rates for consumers.

5.     To the contrary.  Beginning in approximately 2010 and continuing to-date, the TVA has knowingly and intentionally adopted a series of "rate changes" that shifted the costs of electricity from industrial users to domestic consumers, contrary to the Congressional mandate.

6.     These "rate changes" were intended by TVA to be revenue-neutral overall. TVA's sole purpose for the rate changes was to shift more of TVA's costs from industrial users to consumers.

7.     The rate changes included manufacturing credits, discounts for high-volume users and other changes that had the intent and effect of shifting costs from industrial users to consumers.

8.     TVA adopted the rate changes to advance its stated objective "that revenue be recovered in proportion to costs by customer class."

9.     By doing so, TVA was furthering its *new* policy that industrial users should not subsidize domestic users to provide them power at the "lowest possible rates."

10.     By way of example, on information and belief, in 2015 TVA's industrial customers enjoyed rates that were well within the top quartile of its competitors, while residential rates were approximately at the median.  TVA then issued an additional

General Manufacturing Credit and made other rate changes designed to shift revenues from industrial users to domestic consumers.

11.    When put into operation, the 2015 TVA changes had the effect of reducing industry rates by 6.4% on average while increasing domestic consumer rates by 1.1%.  Direct serve industrial consumers saw their rates drop by 9%.

12.    By 2016, the TVA's rate changes had shifted approximately $439 million in rates per annum from domestic consumers to industry.  Changes subsequent to 2016 increased the shift in rates. The result was an ever-increasing burden of high energy bills on the very domestic consumers that Congress had sought to protect with its statutory mandate that TVA charge them the "lowest possible rates."

13.    The Congressional directive that TVA subsidize domestic consumers, and provide them with the lowest possible rates by securing "high" profits ("revenue returns") from sales to industry is incorporated into the TVA's form contracts with its distributors. The TVA rate changes are in breach of the TVA's form contract agreements.

14.    Plaintiff seeks compensation for himself and other victims of TVA's illegal  rate changes, along with declaratory and injunctive relief.

**<u>The Parties</u>**

15.    Plaintiff David Holbrook is a resident of Bristol, Virginia.

16.    Defendant Tennessee Valley Authority ("TVA") is a body corporate created pursuant to the Tennessee Valley Authority Act of 1933 (the "TVA Act").  16 U.S.C.A. § 831.

17.    Defendant BVU Authority ("BVU") is a political subdivision of the Commonwealth of Virginia, created in 2010 pursuant to the BVU Authority Act, Va. Code Ann. § 15.2-7201.  The BVU Authority is the successor to Bristol Virginia Utilities, which had served as a separately managed and financed division of the City of Bristol, Virginia.

3

18.     The TVA is authorized by statute to sue and be sued in its corporate name, and to enter contracts.  16 U.S.C.A. § 831c (West).

19.     In Virginia, the TVA sells electricity to BVU and Powell Valley Electric Cooperative for resale to more than 20,000 households in Lee, Scott, Washington and Wise counties.

20.     Plaintiff is a domestic consumer of electricity who purchases TVA-supplied electricity from BVU, subject to the form contract between TVA and BVU.

**Jurisdiction and Venue**

21.     This Court has federal question jurisdiction over claims and actions against TVA pursuant to 28 U.S.C. §§ 1331 and 1337.

22.     The United States Court of Federal Claims has no jurisdiction over claims against TVA. 28 U.S.C. § 1491(c).

23.     Venue in this Court is appropriate under 28 U.S.C. § 1391(b).

**Facts**

**A.  The TVA Act**

**1.  The TVA**

24.     The TVA was established in 1933 as one of President Roosevelt's Depression-era New Deal programs.

25.     At that time of the TVA's formation, only about ten percent of rural Americans had access to electricity. The TVA was authorized to generate and transmit electricity "primarily as for the benefit of the people of the section as a whole and particularly the domestic and rural consumers to whom the power can economically be made available."  16 U.S.C.A. § 831j (West).

26.     Today, the TVA is the nation's largest public power provider.

27.     TVA's direct customers include approximately 60 large "direct serve" industrial customers, as well as 154 individual local power companies ("LPCs," or "Local Power Companies") who resell the electricity to retail customers in parts of seven southeastern states, including portions of the territory comprising the United States District Court for the Western District of Virginia.

28.     Local Power Companies, such as BVU, that receive electricity from the TVA re-sell the electricity at retail to industrial users, commercial users and domestic users (*i.e.* consumers) in Tennessee, Alabama, Mississippi, Kentucky, Georgia, North Carolina, and Virginia.

### 2.  The TVA Act Directs the TVA to Provide Power to Consumers at "the lowest possible rates" and to Set Industrial Rates to Generate Revenues by Which to Maximize Subsidies to Consumers.

29.     The TVA Act authorizes the TVA to sell electricity to Local Power Companies, including municipal power companies and electricity cooperatives.

30.     The TVA Act also authorizes the TVA to set "resale rates," *i.e.* the rates that customers must pay to the local power authorities for the electricity supplied by the TVA.

31.     The TVA Act establishes a clear policy for how costs and rates are to be allocated between domestic consumers and industry.

32.     The TVA Act provides, in pertinent part,

> . . .that the projects herein provided for shall be considered primarily as for the benefit of the people of the section as a whole and particularly the domestic and rural consumers to whom the power can economically be made available, *and accordingly that sale to and use by industry shall be a secondary purpose, to be utilized principally to secure a sufficiently high load factor and revenue returns which will permit domestic and rural use at the lowest possible rates* and in such manner as to encourage increased domestic and rural use of electricity.

16 U.S.C.A. § 831j (West)(emphasis added).

This Complaint will refer to the italicized language in the quotation from § 831j above as the "Lowest Possible Domestic Rates" provision.

33.     Through the Lowest Possible Domestic Rates provision, Congress required that the TVA treat end-users of TVA electricity unequally.

34.     The  Lowest Possible Domestic Rates provision mandates that the TVA sell electricity to industry at rates that maximize the subsidy that domestic users receive so that they can be charged the lowest possible rates.

**B.     The TVA Contract with Local Power Companies**

35.     Acting pursuant to the TVA Act, the TVA has entered form power contracts with its Local Power Companies.

36.     A sample form TVA contract with a municipal power company is attached hereto as Exhibit A; a sample form of a TVA contract with an electricity cooperative is attached hereto as Exhibit B.

37.     On information and belief, the form elements of TVA's contract with BVU Authority are essentially the same in all pertinent respects to the contracts attached hereto as Exhibits A and B. (The form TVA contract will be referred to herein as the "TVA Contract").

38.     The TVA Contract provides that, pursuant to the TVA Act, the contract is made for the benefit of the consumers of electricity, a principle which is mutually recognized as the "essence of the contract."  TVA Contract at § 1.

39.     Under the TVA Contract, resale rates are to be capped at a total amount that is "not substantially greater than" the amounts necessary to fund operations.  TVA Contract, § 1.

40.     The TVA Contract imposes on municipalities, cooperatives and other local power companies the obligation to impose the resale rates established pursuant to the contract.

41.     The TVA Contract imposes different resale rates for different classes of customers, including industrial users, commercial users and domestic users (consumers).

42.     The TVA Contract requires that customers in each class be treated identically but requires disparate treatment of customers in different classes.

43.     Under the TVA Contract, TVA may request that the TVA and Local Power Company meet and endeavor to reach agreement upon changes to the contract's Schedule of Rate and Charges.

44.     If the parties cannot reach agreement within 180 days on the TVA's proposed changes to the contract's Schedule of Rate and Charges, TVA may thereafter, upon 30 days' notice, place into effect such changes as TVA determines in its view will enable it to carry out the objectives of the TVA Act and meet the requirements and tests of TVA's bond resolutions.

**C.      The TVA's Rate-Setting Structure**

45.     The TVA calculates separately (1) the amount of revenue it needs to derive from retail sales, and (2) the methodology by which the necessary revenues are to be allocated among different classes of customers.

46.     In TVA parlance, a "Rate Adjustment" refers to an across-the-board increase or decrease in rates to meet revenue needs.  In contrast, a "Rate Change" refers to the process by which TVA changes the structure of rates or the allocation of costs.

47.     A Rate Change is intended by the TVA to be revenue neutral to the TVA but may alter the allocation of costs across different classes of consumers.

48.     The primary classes of consumers include (i) large, direct-serve customers, and (ii) industrial, (iii) commercial, and (iv) domestic consumers served by the Local Power Companies.

49.     Because a Rate Change is designed to be revenue neutral, a Rate Change that reduces rates for industrial customers of necessity increases rates for other customers, including domestic consumers.

**D.  The TVA's Strategic Pricing Plan.**

50.     Even prior to 2010, the rates charged to domestic consumers were significantly higher than the rates charged to industrial users [why do we say this? Doesn't it serve to undercut our case?  Or is our argument that beginning in 2010, TVA for the first time changing rates with the stated purpose of shifting the burden from industry to consumer?].

51.     Beginning in approximately 2010, the TVA embarked on a series of Rate Changes in what it has called its "Strategic Pricing Plan."

52.     The TVA described its intended purposes in implementing the Strategic Pricing Plan in numerous documents.  Not once in those documents did the TVA identify its statutorily mandated goal of "achieving domestic and rural use at the lowest possible rates" as an intended purpose of its Strategic Pricing Plan.

53.     To the contrary, according to the TVA itself, the TVA's Strategic Pricing Plan was designed by the TVA to advance purposes in direct conflict with the Lowest Possible Domestic Rates provision.  These unauthorized purposes included "that revenue be recovered in proportion to costs by customer class;" that all users be treated "fairly;" and "improv[ing] competitiveness of industrial rates."

54.     These goals of the TVA conflict with the Lowest Possible Domestic Rate provision of the TVA Act, which requires the TVA to subsidize domestic consumer from the profits it earns on sales to industrial users and provide them with the lowest possible rates.

55.     As a result, the TVA implemented rate changes that it knew violated the Lowest Possible Domestic Rate provision of the TVA Act because those changes were made pursuant to a new policy that was expressly contrary to the statutory provision.

### 1. The TVA's 2010 Structural Rate Change.

56.     On information and belief, prior to 2010 the TVA had no evidence and did not conclude that domestic consumers were paying rates that were lower than the Lowest Possible Domestic Rate.

57.     In 2010, the TVA implemented a structural rate change that it described as the "Elimination of End-Use Wholesale Rate Structure and Introduction of Time-of-Use Pricing for Electricity at The Wholesale Level" (the "2010 Rate Change").

58.     The 2010 Rate Change was described in part in a July 20, 2010, Final Environmental Assessment, attached hereto as Exhibit C (the "2010 EA")

59.     According to the 2010 EA, the 2010 Rate Change attempted to adjust TVA's pricing to reflect the time of year in which electricity was used.

60.     The 2010 EA identifies a number of goals to be achieved by the 2010 Rate Change but does not state that a goal of the 2010 Rate Change was to create or maintain the lowest possible rates for domestic consumers.

61.     The 2010 EA states that the TVA expected that the 2010 Rate Change would be as close as possible to cost neutral for classes of end-users.

62.     In practice, the 2010 Rate Change shifted significant costs from industrial users to domestic consumers.

63.     According to a report prepared for Southern Alliance for Clean Energy by Synapse Energy Economics, Inc. (the "Synapse Report") the 2010 Rate Change had the effect of shifting costs from industry to domestic consumers.

64.     According to the Synapse Report, by 2013, TVA was effectively charging consumers nearly ten percent more than they had been in 2010, while it was effectively charging industrial users five percent less than it had in 2010.

65.     On information and belief, the TVA knew or should have known that the 2010 Rate Change would shift costs from industry users to domestic consumers.

66.     The TVA did not take sufficient steps to ensure that the 2010 Rate Change would not shift costs from industry users to domestic consumers.

67.     After learning of the effects of the 2010 Rate Change, the TVA took no action to reverse the cost-shifting from industry to domestic consumers that its rate change had caused.

68.     Instead, the TVA continued to implement additional rate changes with the purpose and effect of shifting costs from industrial users to domestic consumers.

**2.  The 2013 Reduction in Industrial Rates.**

69.     On information and belief, prior to 2013 domestic consumers were not paying less than the Lowest Possible Domestic Rate.

70.     Nevertheless, in 2013 the TVA implemented a targeted rate reduction to industrial customers (the "2013 Industrial Rate Reduction"). Facts concerning the 2013 Industrial Rate Reduction are contained in the TVA's 2016 Strategic Pricing Plan, attached hereto as Exhibit D.

71.     Under the 2013 Industrial Rate Reduction plan, the TVA provided manufacturers with a 0.2 c/kWh credit for a two-year period. On information and belief, the credit later was increased to .54.

72.     Due to the method by which the TVA calculates its rates, a rate reduction to industrial users necessarily resulted in a rate increase on domestic consumers.

73.     The 2013 Industrial Rate Reduction had the effect of increasing rates on domestic consumers.

74.     The 2013 Industrial Rate Reduction moved TVA's industrial rates into the top (cheapest) quartile of power company industrial rates.

75.     The change resulted in the TVA achieving an industry-wide ranking for industrial rates that was better than TVA's industry-wise ranking for domestic consumer rates.

### 3. The 2015 rate structure change.

76.     By 2015, the TVA's industrial rates were more competitive than its domestic consumer rates, according to the TVA's own analysis.

77.     By 2015, domestic consumers were not paying less than the Lowest Possible Domestic Rate.

78.     On information and belief, the following chart was presented to the TVA Board of Directors at its August 2015 meeting:



**Source: TVA Board Meeting, August 2015**

79.    As demonstrated by the TVA's chart, for the period running from May 2014 to April 2015, the TVA's effective retail rate of $9.03 per kWh ranked 35th. The retail rate was set at about 33 cents above the amount that would have placed it in the cheapest quartile of domestic consumer rates.

80.    In contrast, the TVA's effective industrial rate of $5.68 per kWh ranked 13th.  The industrial rate was set at about 62 cents below the amount that would have placed it in the cheapest quartile of domestic consumer rates.

81.    Nevertheless, in 2015 the TVA implemented a General Manufacturing Credit of 1.1c per KwH to replace the 2013 Industrial Rate Reduction credit of.02c per KwH.

82.    The 2015 rate change also included a demand credit of $1.38 to $1.63 per kW.

83.    The 2015 rate change did not impose any conditions or commitments on the part of industrial users.

84.     In describing the changes, the TVA acknowledged that its purposes in implementing a rate change were "to improve industry competitiveness." *See* SACE at 45-46.

85.     The 2015 rate change was intended to increase rates on consumers while reducing rates for industry.

86.     In addition to the General Manufacturing Credit, TVA also changed the structure of its fuel cost adjustment (FCA) in a manner that shifted costs from industrial to residential customers.

87.     The TVA estimated that the 2015 Rate Change revenue would be revenue neutral to the TVA, while shifting costs from industrial users to domestic consumers.

88.     The TVA's 2015 Environmental Assessment (the "2015 EA") of the 2015 Rate Change estimated that the rate structure changes would increase residential rates by about 0.4% while reducing rates for large commercial and industrial customers by between 1.7% and 3.6%. (A copy of the 2015 EA is attached hereto as Exhibit E.).

89.     In practice, from 2015 to 2016, average residential rates increased 1.1%, while average industrial rates fell by 6.4% and average direct serve business consumers' rates fell by 9.0%, as detailed in the Synapse Report.

### 4. The 2018 Rate Structure Change

90.     In 2016, TVA reported in its Strategic Pricing Plan whitepaper that "TVA has more large industrial customers relative to peers," who have "lower costs and lower rates."

91.     By 2018, domestic consumers were not paying less than the Lowest Possible Domestic Rate.

92.     In 2018, the TVA imposed additional rate changes that shifted costs from industrial users to residential users (the "2018 Rate Changes").

93.     As described in the TVA's 2018 Environmental Assessment (the "2018 EA") of the 2018 Rate Change, the 2018 Rate Changes reduced energy rates for large general service customers by at least $23 million.  A copy of the 2018 EA is attached hereto as Exhibit F.

94.     In order to "maintain TVA revenue neutrality," TVA increased rates on other customers, included domestic consumers, to make up the savings to the large general service customers.  *Id.*

95.     The 2018 Rate Changes also reduced wholesale energy rates across the board by 0.5 cent/kWh and recouped the lost revenue through a Grid Access Charge.  This action shifted approximately $600 million in revenue from charges based on customers' electricity usage to fixed charges under which a portion of customers' electricity rates are set regardless of electricity use.  This change shifted costs from industrial users to domestic consumers.

96.     The 2018 Rate Changes also reduced rates for customers who use the most electricity.  Under these changes, customers consuming up to 1,000 kWh per month were to see increases in their monthly bills of up to approximately 2%. At the same time, TVA anticipated that customers who used more than 1,000 kWh per month would see a rate decrease.  The very largest energy consumers were expected to see a decrease in their monthly bills of more than 3%.

97.     The following chart was prepared by the TVA to show the impact of this latter change, which reduced rates for larger users:



98.     The chart shows that smaller users, the category that includes most domestic consumers, would assume an increasing burden from rate reductions provided to larger industrial users.

99.     In adopting the 2018 Rate Changes, the TVA stated that it advanced a "TVA objective[] in setting rates: that revenue be recovered in proportion to costs by customer class."

100.    The overall effect of the 2018 Rate Changes was to further shift costs from industrial users to domestic consumers, in violation of the Lowest Possible Domestic Rate provision.

E.  **Under the TVA's Rate Adjustments, Domestic Consumers Are Subsidizing Industry, Instead of the Other Way Around.**

101.    As a direct impact of the Rate Changes imposed by the TVA, TVA domestic consumers paid 13% more for electricity in 2016 than they did in 2010, while industrial customers paid 11% less.  If the TVA had allocated the rate changes equally to domestic consumers and industry alike, consumers would have paid $439 million less in electricity costs in 2016.

102.    Based on the changes implemented since 2016, it is likely that consumers are currently paying approximately $500+ million per annum more today than they would have in the absence of TVA's rate changes.

103.    TVA knew that its Rate Changes would shift costs from industrial users to domestic users.

104.    TVA intended that its Rate Changes shift costs from industrial users to domestic consumers.

105.    The Rate Changes were not undertaken for the purpose of reducing domestic consumer rates.

106.    The Rate Changes did not have the effect of reducing domestic consumer rates.

107.    TVA did not implement the rate changes for the purpose of reducing domestic consumer rates to the Lowest Possible Domestic Rate.

108.    TVA implemented the Rate Changes knowing that they would result in a rate that was not the Lowest Possible Domestic Rate.

109.    The rates imposed by TVA for the period beginning in 2010 and continuing are not the Lowest Possible Domestic Rate.

**F. The TVA's Statements of Purpose Confirm that Its Violation of the Lowest Possible Domestic Rate Provision is Intentional.**

110.    TVA has issued numerous public statements describing the purposes of the rate changes in its Strategic Pricing Plan.  Never has TVA acknowledged the Lowest Possible Domestic Rate provision, or asserted that its rate changes are in compliance with that statutory provision.

111.    In some instances, TVA has described its rate changes as advancing purposes that conflict with the Lowest Possible Domestic Rate Provision.

112.    For example, in its 2018 K-1, the TVA described the rate changes as follows:

> Since the fall of 2013, TVA, LPCs, and directly served industries have worked collaboratively to develop changes to TVA's rates that focus on TVA's long-term pricing efforts.  A comprehensive rate restructuring was implemented in October 2015 to improve pricing by better aligning rates with underlying cost drivers and to send improved pricing signals, while maintaining competitive industrial rates and keeping residential rates affordable.

> Consistent with the pricing goals and changes implemented in the 2015 rate restructuring, TVA staff recommended, and the TVA Board approved, the proposed 2018 rate change on May 10, 2018. This change will reduce wholesale energy rates for Standard Service and introduce a Grid Access Charge ("GAC") at an offsetting rate to better recover fixed costs. Recognizing the need for flexibility, TVA presented all LPCs with the option to implement the wholesale changes in October 2018 or defer the implementation of the GAC until October 2019. The 2018 rate change better reflects the wholesale cost of energy and recognizes the value of the grid's reliability and associated fixed costs. This modernized approach to pricing provides bill stability while maintaining reliability and fairness for all TVA's customers.

113.    The TVA's 2018 K-1 describes a number of TVA policy purposes, including flexibility, market signaling, cost alignment, and grid reliability.  Nowhere in the K-1 does it acknowledge its statutory obligation to impose the Lowest Possible Domestic Rates.

114.    To the contrary, the TVA's stated goals of "maintaining competitive industrial rates and keeping residential rates affordable," and "maintaining . . . fairness for all TVA's customers" are not consistent with and are in conflict with the TVA's statutory duty under the Lowest Possible Domestic Rate provision.

115.    Similarly, the TVA's 2018 K-1 lauds its "modernized approach to pricing" because it "provides bill stability while maintaining reliability and fairness for all TVA's customers." Setting rates using the objective of maintaining "fairness" for all TVA's customers is in direct violation of the Lowest Possible Domestic Rate provision.

116.    In its various Environmental Assessments, the TVA includes a section titled "TVA Rate Setting Authority, Policies, and Procedures." Each of the EA's issued in 2010, 2015 and 2018 includes some version of the following:

> The TVA Board of Directors exercises its rate responsibility within the framework of, and for carrying out, the underlying policies and requirements of the TVA Act including those in Sections 10, 11, and 15(d) of the Act. Section 10 of the TVA Act authorizes the TVA Board of Directors "to include in any contract for the sale of power such terms and conditions, including resale rate schedules, and to provide for such rules and regulations as in its judgment may be necessary or desirable for carrying out the purposes of this Act."

> Under Section 11 of the TVA Act, power projects are to "be considered primarily as for the benefit of the people" of the region as a whole, particularly the "domestic and rural" consumers to whom the power can economically be made available. As part of the bond financing amendment to the TVA Act in 1959, Congress directed TVA to: charge rates that produce gross revenues sufficient to provide funds for operation, maintenance, and administration; provide payments to states and counties in lieu of taxes; provide debt service on bonds; provide payments to the United States Treasury for repayment of past government appropriations plus an additional return; provide additional margin for investment in power system assets; and for other purposes connected with TVA's power business [TVA Act, Section 15(d)].

117.     The TVA EA's omitted the Lowest Possible Domestic Rate provision from its description of the statutory framework it was purportedly implementing in adopting a Rate Change.

118.     The TVA's omission of the single Congressional purpose established by the TVA Act for allocating rates among classes accurately mirrors its approach in implementing the Strategic Pricing Plan, since the Strategic Pricing Plan neglected to consider in any way the Lowest Possible Domestic Rate provision.

119.     The TVA's Rate Changes described herein, individually and in the aggregate, were imposed in knowing and willful disregard of the TVA's duties under the Lowest Possible Domestic Rates provision.

120.     The TVA's Rate Changes described herein, individually and in the aggregate, had the purpose and effect of shifting revenue returns from industrial users to consumers.

121.     The TVA's Rate Changes described herein, individually and in the aggregate, were not intended to produce the lowest possible rates for domestic users of electricity.

122.     The Rate Changes in the TVA Strategic Pricing Plan, individually and in the aggregate, were intended to reduce revenue returns from industrial users and to increase rates for domestic users of electricity.

123.     Through the Rate Changes described herein, the TVA implemented a policy that domestic users of TVA generated electricity *not* pay the lowest possible rates for electricity.

124.     As a result of the TVA's Rate Changes described herein, domestic consumers of TVA-generated-electricity did not pay and do not pay the lowest possible rates for electricity.

125.     The TVA's adoption of unlawful purposes in its Strategic Pricing Plan resulted in rates that violated the Lowest Possible Domestic Rates provision.

## **Class Allegations**

126.     Plaintiff is currently a customer of BVU, and has been since December 2012.

127.     As a result of the facts alleged herein, Plaintiff has paid higher rates for energy that he would have paid if TVA had set consumer rates in accordance with the statutory mandated.

128.     Plaintiff brings this Complaint on behalf of a class of all persons in the "TVA Class," which is defined as follows:

> All persons who within the statute of limitations period were domestic customers of TVA.

129.     Plaintiff also brings this Complaint on behalf of all persons in the "BVU Sub-Class," which is defined as follows:

> All persons who within the statute of limitations period were domestic customers of BVU and who received energy pursuant to a contract between the TVA and the BVU.

130.     The TVA Class and BVU Sub-Class (the "Classes") are so numerous that joinder of all the members is impracticable.  There are approximately ten million members of the TVA Class, and thousands of members in the BVU Sub-Class.

131.     The questions of law or fact at issue in Plaintiff's claim are common to each of the Classes, including, *inter alia*, the following:

- The meaning, interpretation and enforceability of the Lowest Possible Domestic Rate provision of the TVA Act.

- The TVA's legal obligations under the TVA Contract.

- The Strategic Pricing Plan's compliance with the Lowest Possible Domestic Rate provision of the TVA Act.

- The Strategic Pricing Plan's compliance with the TVA Contract.

- Calculation of the Lowest Possible Domestic Rate provision.

- The relief appropriate for enforcing the Class's rights under the Lowest Possible Domestic Rate provision.

132.   Plaintiff's claims are typical of the claims of each of the Classes.  All members of each Class, including Plaintiff, have been injured by the same or similar acts by TVA in failing to establish rates that complied with the Lowest Possible Domestic Rate provision.

133.   Plaintiff will adequately represent the interests of each of the Classes.

134.   A class action is superior to other available methods for the fair and efficient adjudication of these claims. Prosecution of separate claims by individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to TVA and BVU's legal duties under the TVA Act, the TVA contract and otherwise.

135.   A class action also is superior because prosecuting separate actions by individual class members would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

136.   Defendant has acted and refused to act on grounds generally applicable to the putative class members, including Named Plaintiff, thereby making appropriate injunctive and declaratory relief for the class as a whole.

137.     In the alternative, questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## CAUSES OF ACTION
### As and For a First Cause of Action
### Breach of Contract
### (Against TVA and BVU)

138.     Plaintiff repeats and realleges the allegations previously set forth as if fully set forth herein.

139.     Plaintiff is an intended beneficiary of the TVA Contract.

140.     The Lowest Possible Domestic Rate provision is incorporated into the TVA Contract.

141.     The TVA and BVU violated and continue to violate the Lowest Possible Domestic Rate provision.

142.     The TVA and BVU have breached the TVA Contract.

143.     Plaintiff and the Classes have suffered damage as a direct result of the TVA's and BVU's breach.

### As and For a Second Cause of Action
### Against TVA
### Violation of the Administrative Procedure Act
### (5 U.S.C. § 702)

144.      Plaintiff repeats and realleges the allegations previously set forth as if fully set forth herein.

145.     The TVA's actions in setting rates that were not in compliance with the Lowest Possible Domestic Rate provisions is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

22

146.    The TVA has unlawfully failed to meet its obligation to set rates in in compliance

with the Lowest Possible Domestic Rate provision.

147.    The TVA's Rate Changes described herein were in excess of statutory

jurisdiction, authority, or limitations, or short of statutory right.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Certify the proposed TVA Class and BVU Sub-Class herein and appoint Plaintiff and the undersigned counsel of record to represent each class;

2. Declare that TVA has violated the TVA Act by failing to comply with the Lowest Possible Domestic Rate provision;

3. Enjoin TVA from further violation of the TVA Act;

4. Award Plaintiff and the Plaintiff Class damages in an amount to be determined at trial;

5. Direct TVA and BVU to cause the repayment of rates that exceeded the Lowest Possible Domestic Rates;

6. Award Plaintiff their costs, attorneys' fees, and other disbursements for this action, including any expert witness fees; and

7. Grant Plaintiff such other and further relief as the Court may deem just and proper.

DATED: June 9, 2020

Respectfully submitted,

      /s/   Mark T. Hurt
Mark T. Hurt (VSB # 36380)
The Law Offices of Mark T. Hurt
159 West Main St.
Abingdon,Virginia 24210
276-623-0808-Telephone
276-623-0212-Fax
Mail@MarkHurtLawFirm.com

23

Martin Bienstock
*Pro hac vice pending*
Bienstock PLLC
Suite 300
1629 K. St. NW
Washington, DC 20006
202-908-6601
mbienstock@bienstockpllc.com