# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | | |
|---|---|---|
| **DAVID HOLBROOK,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:20CV00025 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **TENNESSEE VALLEY AUTHORITY, ET AL.,** | ) | By: James P. Jones |
| | ) | United States District Judge |
| | ) | |
| Defendants. | ) | |

*Martin Bienstock,* BIENSTOCK, PLLC, *Washington, D.C., and Mark T. Hurt Abingdon, Virginia, for Plaintiff; Maria V. Gillen,* OFFICE OF GENERAL COUNSEL, TENNESSEE VALLEY AUTHORITY, *Knoxville, Tennessee, for Defendant Tennessee Valley Authority; Cameron S. Bell,* PENN, STUART & ESKRIDGE, *Abingdon, Virginia, for Defendant BVU Authority.*

In this proposed class action concerning electricity rates charged by the Tennessee Valley Authority (TVA), the defendants have filed motions to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). For the reasons that follow, the motions will be granted.

I.

The Amended Class Action Complaint alleges the following facts, which I must accept as true for purposes of deciding the motions to dismiss.

TVA is the nation's largest public power provider. It was formed during the Great Depression at a time when most rural American households could not access

electricity. Currently, TVA sells electricity directly to about 60 large industrial customers and to 154 local power companies, who in turn distribute the electricity to industrial, commercial, and residential customers in the southeastern United States.

The Tennessee Valley Authority Act (TVA Act) includes the following provision:

> It is declared to be the policy of the Government so far as practical to distribute and sell the surplus power generated at Muscle Shoals equitably among the States, counties, and municipalities within transmission distance. This policy is further declared to be that the projects herein provided for shall be considered *primarily as for the benefit of the people of the section as a whole and particularly the domestic and rural consumers to whom the power can economically be made available*, and accordingly that *sale to and use by industry shall be a secondary purpose, to be utilized principally to secure a sufficiently high load factor and revenue returns which will permit domestic and rural use at the lowest possible rates and in such manner as to encourage increased domestic and rural use of electricity*. It is further declared to be the policy of the Government to utilize the Muscle Shoals properties so far as may be necessary to improve, increase, and cheapen the production of fertilizer and fertilizer ingredients by carrying out the provisions of this chapter.

16 U.S.C. § 831j (emphasis added).

Beginning in 2010, through its Strategic Pricing Plan, TVA adopted a series of rate changes that were intended to be revenue neutral. In other words, TVA anticipated that the rate changes would neither increase nor decrease its total revenue but would result in some customers paying more and others paying less for the same amount of electricity used. "The rate changes included manufacturing

credits, discounts for high-volume users and other changes that had the intent and effect of shifting costs from industrial users to consumers." Am. Class Action Compl. ¶ 7, ECF No. 27. TVA's purpose in adopting these rate changes was to further its stated objective that revenue collected from each customer class should be proportional to the costs associated with that customer class. One of TVA's goals was to make its industrial rates more competitive.

In 2010, TVA implemented a rate change that sought to adjust pricing based on the time of year electricity was used. TVA expected that this change would be nearly cost-neutral for classes of end-users, but in practice, it shifted costs from industrial customers to domestic customers. TVA documents attached to the Amended Complaint suggest that this is so because industrial customers tend to use more electricity in milder seasons, while commercial and residential customers tend to use less electricity when the weather is mild. By 2013, domestic customers were paying approximately 10% more than they had in 2010, while industrial customers were paying approximately 10% less.

In 2013, TVA gave industrial customers a rate reduction for two years. This change, too, was designed to be revenue neutral, and domestic rates correspondingly increased. As a result, "TVA achiev[ed] an industry-wide ranking for industrial rates that was better than TVA's industry-wide ranking for domestic consumer rates." *Id.* ¶ 74.

"By 2015, the TVA's industrial rates were more competitive than its domestic rates, according to the TVA's own analysis." *Id.* ¶ 75.  In 2015, TVA's industrial customers were charged electricity rates within the top 25% of those charged by TVA's competitors, and TVA's residential customers were charged rates that were approximately at the median of those charged by TVA's competitors.  TVA then instituted another manufacturing credit and made other rate changes.  As a result, the rates TVA charged to industrial consumers were reduced by 6.4% on average, and direct-serve industrial consumer rates were decreased by 9%, while the rates TVA charged to domestic consumers increased by 1.1%.  "By 2016, the TVA's rate changes had shifted approximately $439 million in rates per annum from domestic consumers to industry.  Changes subsequent to 2016 increased the shift in rates." *Id.* ¶ 12.

TVA adopted additional revenue-neutral rate changes in 2018.  It reduced rates for large general service customers and increased rates for other customers, including domestic consumers.  TVA also reduced wholesale energy rates for all users and instituted a Grid Access Charge.  "This action shifted approximately $600 million in revenue from charges based on customers' electricity usage to fixed charges under which a portion of customers' electricity rates are set regardless of electricity use." *Id.* ¶ 94.  The change benefitted industrial users to the detriment of domestic users.

TVA enters into standard form contracts with its distributors, one of which is defendant BVU Authority (BVU). Expressly incorporated into these contracts is the statutory directive that sale of electricity to industry should be used primarily to ensure the provision of electricity to domestic consumers at the lowest possible rates. TVA sets the resale rates that distributors like BVU charge their customers. Different classes of customers — industrial users, commercial users, and domestic users — are charged different rates, but all customers within a user class are charged the same rate. Local power companies and TVA can attempt to agree on changes to rates and charges, but if they are unable to reach agreement, TVA is empowered to change rates unilaterally.

Plaintiff David Holbrook is a customer of BVU. He alleges that he has paid higher rates for electricity than he would have paid had TVA not implemented the aforementioned rate changes, which he contends violate the TVA Act's directive that rates should be set to ensure the lowest possible rates for domestic consumers. He brings this action on behalf of a class of TVA residential customers and a subclass of BVU residential customers who received electricity pursuant to a contract between TVA and BVU.

Count One of the Amended Class Action Complaint asserts a breach of contract claim against both defendants. Holbrook avers that he is an intended third-party beneficiary of the contract between TVA and BVU. He claims that

TVA and BVU have violated the "lowest possible rates" provision contained in the contract.

Count Two claims that TVA has violated the Administrative Procedure Act (APA), 5 U.S.C. § 702, by acting arbitrarily and capriciously in setting rates that were not the lowest possible rates for domestic consumers of energy. He contends that TVA's rate changes exceeded TVA's statutory jurisdiction and authority.

Count Three is a claim of unlawful exaction. Here, Holbrook alleges that TVA caused him to pay rates that exceeded the amount that could lawfully be charged under the TVA Act.

The defendants have moved to dismiss the Amended Class Action Complaint. They contend that this court lacks subject-matter jurisdiction over the plaintiff's claims because TVA's rate-setting decisions are judicially unreviewable due to the broad discretion the TVA Act grants to TVA. They further argue that even if this court had jurisdiction, Holbrook's claims are barred by the statute of limitations, and he has failed to state viable claims of breach of contract, violation of the APA, or exaction. The motions have been fully briefed and orally argued.

II.

Federal courts have limited jurisdiction and are empowered to act only in the specific instances authorized by Congress. *Bowman v. White*, 388 F.2d 756, 760 (4th Cir. 1968). The court must determine questions of subject-matter jurisdiction

before it can address the merits of a case. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). Thus, when a party moves to dismiss for lack of subject-matter jurisdiction and for failure to state a claim, the court must address the question of subject-matter jurisdiction first. *Bell v. Hood*, 327 U.S. 678, 682 (1946). The party asserting federal jurisdiction bears the burden of proving jurisdiction. *See Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). A district court must grant a Rule 12(b)(1) motion to dismiss "if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.* at 768.

"A long line of precedent exists establishing that TVA rates are not judicially reviewable." *McCarthy v. Middle Tenn. Elec. Membership Corp.*, 466 F.3d 399, 405 (6th Cir. 2006) (citation omitted). While the APA generally provides for judicial review of agency actions, such an action is unreviewable if it is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).[1] That exception

---

[1] There is a circuit split regarding whether the APA's exemption from judicial review of actions committed to agency discretion affects a court's subject-matter jurisdiction. The D.C. Circuit has concluded that "a complaint seeking review of agency action 'committed to agency discretion by law,' 5 U.S.C. § 701(a)(2), has failed to state a claim under the APA, and therefore should be dismissed under Rule 12(b)(6), not under the jurisdictional provision of Rule 12(b)(1)." *Sierra Club v. Jackson*, 648 F.3d 848, 854 (D.C. Cir. 2011). The Sixth Circuit considered the issue and reached the opposite conclusion in an unpublished opinion, finding, "In classes of cases where we have no meaningful standard by which to evaluate the agencies' exercise of discretion, we have no jurisdiction." *Sheldon v. Vilsack*, 538 F. App'x 644, 649 n.4 (6th Cir. 2013) (unpublished). Most courts of appeals considering such challenges have addressed them as jurisdictional issues. *See, e.g., Gentile v. Sec. & Exch. Comm'n*, 974 F.3d 311, 320 (3d

is read narrowly. *Weyerhaeuser Co. v. United States Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018). "It applies only in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." *Elecs. of N.C., Inc. v. Se. Power Admin.*, 774 F.2d 1262, 1266 (4th Cir. 1985) (internal quotation marks and citations omitted).

In *Electricities of North Carolina*, the Fourth Circuit held that a statutory directive to distribute power "in such a manner as to encourage the most widespread use thereof at the lowest possible rates to consumers consistent with sound business principles" essentially granted the agency unfettered discretion and was too vague to supply a standard for judicial review of agency decisions. *Id.* at 1264, 1266 (quoting 16 U.S.C. § 825s). The language considered in that case is analogous to the "lowest possible rates" provision of the TVA Act, and I conclude that it, too, sets forth no meaningful standard for courts to apply.

Holbrook characterizes the "lowest possible rates" clause as a subsidy mandate, but that is an overly simplistic reading of the statute. The TVA Act does not state that industrial rates must be lower than residential rates or that industrial users must bear more than their pro rata share of the costs of delivering electricity

---

Cir. 2020); *Vela-Estrada v. Lynch*, 817 F.3d 69, 71–72 (2d Cir. 2016); *Animal Legal Def. Fund v. U.S. Dept. of Agric.*, 789 F.3d 1206, 1214 (11th Cir. 2015) ("Whether an agency action is reviewable under § 701(a)(2) is a matter of subject matter jurisdiction."); *Gulf Restoration Network v. McCarthy*, 783 F.3d 227, 237–28 (5th Cir. 2015). I agree that whether an agency's action is reviewable under § 701(a)(2) raises a question of subject-matter jurisdiction, for the reasons stated in *Sheldon*.

in order to subsidize residential consumers. Section 831j sets forth several polices – to equitably distribute power, to benefit the people as a whole and domestic and rural consumers in particular – and tempers them with phrases such as "so far as practical" and "economically." Sale of electricity to industry is to be utilized not only to secure revenue returns, but also to secure "a sufficiently high load factor." *Id.* The statute contemplates that sale to industry will be used to permit domestic and rural use not only "at the lowest possible rates," but also "in such manner as to encourage increased domestic and rural use of electricity."[2] *Id.*

Based on the environmental assessments, responses to public comments, and other documents attached to the Amended Complaint, TVA appears to have concluded that reducing rates for industry would encourage a sufficiently high load factor as well as a more consistent demand for electricity, and perhaps greater overall use by industry. This would, in TVA's estimation, satisfy the statutory "objective that power shall be sold at rates as low as are feasible." 16 U.S.C. § 831n-4. TVA could reasonably have decided that reducing industry rates would have the ultimate effect of lowering electricity bills for all users, including rural and domestic users.

It is unnecessary at this junction to delve into the weeds of TVA's thought processes. The statute simply does not say what the plaintiff suggests it says. A

---

[2] As the Fourth Circuit noted more than 35 years ago, "The goals of rural electrification hav[e] been, by and large, realized." *Elecs. of N.C.*, 774 F.2d at 1267 n.4.

review of § 831j and the TVA Act as a whole reveals that TVA is tasked with balancing a number of objectives that are not cabined by clear criteria. This is the essence of commitment to agency discretion by law. There is no law this court could apply to determine whether TVA has complied with § 831j. "[D]eterminations about the level of rates necessary to recover the various costs of operating TVA's power system, as well as the terms and conditions of TVA's power contracts, . . . are part of TVA's unreviewable rate-making responsibilities." *McCarthy*, 466 F.3d at 407 (quoting *4-Cnty. Elec. Power Ass'n v. TVA*, 930 F. Supp. 1132, 1138 (S.D. Miss. 1996)).

Holbrook cannot escape dismissal of this case by rebranding his claims under different legal theories. The court lacks subject-matter jurisdiction over all three counts of the Amended Class Action Complaint, including the plaintiff's claims of breach of contract and exaction, because they all seek review of TVA's discretionary rate-making decisions. *See id.* at 407 ("If we were to review the Cooperatives' actions in enforcing the contract, we would still be reviewing the TVA's actions and thus ignoring the APA's prohibition on judicial review."). The statute ensures that Holbrook's only remedy is a legislative one. Because the court lacks jurisdiction over the plaintiff's claims, the case must be dismissed.

III.

For the foregoing reasons, it is **ORDERED** that the defendants' Motions to Dismiss, ECF Nos. 20, 22, are GRANTED.  It is further **ORDERED** that the plaintiff's Request for Judicial Notice, ECF No. 39, is DENIED AS MOOT because the court considered the referenced statements as true in accord with the applicable standard of review.  A separate Final Order of Dismissal will be entered.

ENTER:  March 19, 2021

/s/  JAMES P. JONES  
United States District Judge